

**FILED**

Sep 08 2021
4:02 pm

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY       s/ dominicf       DEPUTY

Joseph Brady, Plaintiff *pro se*
603 Seagaze Drive, # 1046
Oceanside, CA  92054
Tel: (760) 803-7172

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### SAN DIEGO DIVISION

**JOSEPH BRADY,**

    **Plaintiff,**

    v.

**PAUL T. BREED, Solana Beach, CA,
712 E. Solana Circle, Solana Beach CA
Owner of 1962 Cessna 182F airplane,
N149X, and Deregistered 1971 Benson
B-8M, No. N9242;**

**MATT GRIMM, Chief Operating
Officer, Anduril Industries;**

**ANDURIL INDUSTRIES, a California
Limited Liability Company,
Irvine, California;**

**LESLIE GARDNER, as
Executive Director of the San Diego
Law Enforcement Coordination Center
Carlsbad, California;**

**THE SAN DIEGO LAW
ENFORCEMENT COORDINATION
CENTER ("Fusion Center");**

\*
\*
\*
\* **CIVIL ACTION**
\*
\* **FILE NUMBER**  '21CV1583 CAB AHG
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\* **VERIFIED COMPLAINT FOR**
\* **DECLARATORY RELIEF,**
\* **INJUNCTIVE RELIEF, AND**
\* **FOR RECOVERY OF**
\* **DAMAGES FOR VIOLATIONS**
\* **OF CIVIL AND**
\* **CONSTITUTIONAL RIGHTS**
\* **PURSUANT TO,** *inter alia,*
\* **28 U.S.C. §§ 1983 AND 1985.**
\*
\*
\*
\* **A JURY TRIAL IS DEMANDED**

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.

**ALEJANDRO MAYORKAS,**
**Director, Department of Homeland**
**Security;**

**THE UNITED STATES**
**DEPARTMENT OF HOMELAND**
**SECURITY;**

**CITY OF OCEANSIDE, CALIFORNIA;**

**JOHN DOES 1 - 99,** police officers and
firemen employed by the City of Oceanside,
California, in their individual and official
capacities, whose precise identities are
presently unknown to the Plaintiff,;

**ABC CORPS. 1 - 20,** public and private
organizations whose precise identities are
presently unknown to the Plaintiff;

**INFRAGARD  SAN DIEGO,** a public/
private partnership of the private sector
affiliated with and funded by Department
of Homeland Security/ FBI;

**CITIZEN CORPS SAN DIEGO and**
**COMMUNITY EMERGENCY**
**RESPONSE TEAM ("CERT"),** a public/
private partnership affiliated with and
funded by DHS and FBI;

**UNITED STATES DEPARTMENT OF**
**JUSTICE, Federal Bureau of**
**Investigations;**

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.

#11 **UNITED STATES DEPARTMENT OF**    *
**THE NAVY, ( U.S. Marine Corps.); and**    *
   *
#12 **UNITED STATES OF AMERICA,**    *
**jointly and severally,**    *
   *
       **Defendants.**    *
   *

**SERVE:**
**Merrick Garland,**
United States Attorney General
U. S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530-1000

**Carlos Del Toro,**
Acting Secretary of the U. S. Navy
1000 Navy Pentagon Room No. 48686
Washington, D.C. 20350-1000

**Joseph Maher,** Acting General Counsel
Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.

### PRELIMINARY
### STATEMENT

**A. Overview.**

1.      This lawsuit challenges the constitutionality of a secret U. S. government program named "**Operation Vigilant Eagle**" designed by the U. S. Department of Homeland Security ("DHS") and the Federal Bureau of Investigation ("FBI"") beginning in or around 2009 to systematically  identify, monitor, surveil, harass, intimidate, and pre-empt actions and movement of recently-returning American Military veterans, including but not limited to the Plaintiff,  who might possibly "sympathize with or join in the plans and/or actions of  militia/sovereign-citizen extremist groups."

### "Homegrown Violent Activists" ("HVE's")

2.      Documents released by Human Rights Watch have revealed a joint US Defense Department (DOD) /Department of Homeland Security (DHS) policy that appears to authorize warrantless monitoring of US citizens and green-card holders whom the executive branch regards as **"homegrown violent extremists,"** about whom the U. S. Government is gathering very large amounts of data about US citizens and others without warrants, allegedly pursuant to a longstanding executive order that is shrouded in secrecy.

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.                                                    1

3. The new materials, attached hereto as **Exhibit A**, which Human Rights Watch obtained through a freedom of information request, are training modules that primarily concern **Executive Order 12333 (EO 12333)** which broadly governs the US intelligence agencies' activities, and includes provisions allowing the agencies to collect information on US persons – meaning US citizens and lawful permanent residents, as well as some corporations and associations – in a manner the government has never fully explained to the public. The training slides largely summarize Defense Department procedures concerning EO 12333 that were released in 2016, updating a 1982 version..

4. "These documents point to just how thoroughly the public has been kept in the dark about warrantless surveillance under **Executive Order 12333**," said Sarah St. Vincent, US surveillance and national security researcher at Human Rights Watch. "Their explanations of the order suggest that the government may be carrying out monitoring that poses serious problems for human rights, and Congress should seek more information about what the intelligence agencies are doing in this respect."

5. One of the documents' most troubling aspects is the indication that the Defense Department has authorized its intelligence components to carry out at least some forms of monitoring of US persons without a warrant, based on

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.

designations that use unknown and potentially discriminatory criteria.

Specifically, one of the training documents indicates that this monitoring is

permitted for US persons whom the government regards as **"homegrown**

**violent extremists" (referred to as "HVEs" in the slides)** – even when they

have "no specific connection to foreign terrorist(s)." The government's basis for

this authorization is a revised definition of "counterintelligence" collection

found in the 2016 procedures.

6.      The DOD/DHS training and procedures address several forms of

surveillance, and it is unclear which types the government plans to use when

monitoring **"homegrown violent extremists."**

7.      DOD/DHA may legally only obtain such a warrant if they show

probable cause to believe that the person has committed or is about to commit a

crime, or that the person is "a foreign power or an agent of a foreign power."

The disclosure of the government's policy regarding the surveillance of

**"homegrown violent extremists"** who are not connected to a foreign group

raises profound concerns about whether intelligence and/or law enforcement

bodies are using **EO 12333** to do an end-run around these legal protections.

8.      As an example of "homegrown violent extremists," the Defense

Department official who commented to Human Rights Watch pointed to

individuals who "<u>may be self-radicalized via the internet, social media, etc., and</u> <u>then plan or execute terrorist acts in furtherance of the ideology or goals of a</u> <u>foreign terrorist group.</u>" However, the official refused to respond to a question about the criteria the executive branch uses when designating a US person a "**homegrown violent extremist**" for the purposes of this policy.

9.      Additional questions remain about the range of agencies that may warrantlessly monitor such individuals. The Defense Department official "If the military counterintelligence elements conduct investigations of persons other than active duty military members, they do so jointly with the FBI [Federal Bureau of Investigation]."

10.     The Defense Department official emphasized that urrent law requires that "counterintelligence collection against these [persons other than active duty military members"] or any other individuals or groups, must be predicated upon the 'reasonable belief' standard, which is reviewed through the operational and legal chain of command prior to initiation of any activity. <u>Field</u> <u>personnel may not rely solely upon 'hunches' or intuition' as justification for</u> <u>the initiation of counterintelligence activities.</u>"

11.     "The government's authority to monitor people doesn't depend on their beliefs, or what the government thinks they believe, but on specific

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.                                                                                    4

evidence that gives sufficient reason to think a criminal offense is occurring or that the person is an agent of a foreign power," St.Vincent said. "A secret determination that someone's rights should be curtailed based on undisclosed criteria is incompatible with the rule of law. The government should explain what it's doing as well as its legal basis for doing it."

### B.   Summary of Plaintiff's Claims hereunder.

12.   Specifically, the Plaintiff seeks relief herein for all Defendants' multiple violations undertaken jointly and according to a common plan to violate Plaintiff's Constitutional and other legal rights in connection with unlawful surveillance, investigation, harassment, and campaign to curb and limit Plaintiff's freedom of movement orchestrated by the San Diego Law Enforcement Coordination Center (*i.e.,* "Fusion Center") as directed by DHS, FBI, and U. S. Military elements pursuant to but in violation of the guidelines set for "**Operation Vigilant Eagle.**"

13.   As set forth herein, Plaintiff was wrongfully targeted by the all Defendants acting jointly and according to a common plan based on "Operation Vigilant Eagle" guidelines solely because of the facts that:

(a),  Plaintiff is a recent ex-Marine who was honorably discharged in

2007, and

(b), Plaintiff chose to reside immediately adjacent to the U. S. Marine Corps.' Camp Pendleton, in Oceanside California.

14.    Defendants' joint and concerted  illegal actions (including violations of federal criminal law) violated federal statutes enacted to prevent unlawful spying on United States persons, as well as to protect the rights of U. S. Citizens under the the Constitution.

15.    As set forth herein, in addition to declaratory and injunctive relief, the Plaintiff further herein seeks recovery of damages from the named Defendants, jointly and severally, for such Defendants' wrongful actions taken collectively and  according to a common plan, coordinated and conducted by the San Diego Law Enforcement Coordination Center ("Fusion Center") and the guidelines of "**Operation Vigilant Eagle**," *inter alia*, whereby all such Defendants and their agents and employees, including but not limited to "citizen volunteers" acting on behalf of Defendant Infragard San Diego and/or Defendant Citizen's Corp./ Community Energy Response Team of San Diego ("CERT") misused assets owned or leased by the U. S. Government, or state or locally publicly owned equipment, including but not limited to police automobiles, firetrucks, drones, and/or fixed- wing aircraft owned or leased by

including but not limited to police automobiles, firetrucks, drones, and/or fixed-wing aircraft owned or leased by the United States Marines, and/or police and fire department staff and equipment owned and/or operated by Defendant City of Oceanside employees with the consent of Defendant Oceanside, on a daily basis for the past three (3) years, to systematically and wrongfully surveil, harass, intimidate, and interfere with Plaintiff's freedom of movement and right to privacy, without warrant or Court supervision or oversight, and all such defendants, acting jointly and according to a common plan, further misused and interfered with Plaintiff's access to and use of means of interstate communications, the Internet, interstate telephonic communications and which Defendants, acting jointly according to the common plan referenced above based upon and derived at least in part from the secret program known as **"Operation Vigilant Eagle,"** and all such Defendants further converted and misused police and confidential DOD governmental technology and/or databases, all as part of a deliberate and wrongful campaign of wrongful and illegal actions which were intended to and did intimidate, terrorize, interfere with, and oppress the Plaintiff, an innocent ex-Marine who happened to live right next to the Camp Pendleton Marine Base, by means of physically dangerous, emotionally violent, and other injurious and damaging actions,

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.                                                    7

including but not limited almost daily dangerous and harassing "buzzing" of

Plaintiff, Plaintiff's home and Plaintiff's movements on foot and by automobile

by police and/or privately-owned automobiles, firetrucks, drones and fixed-

wing aircraft, often within ten (10) feet of Plaintiff, Plaintiff's automobile,

and/or Plaintiff's home, all pursuant to the joint plan of all Defendants to harass

and intimidate and otherwise obstruct the Plaintiff's free exercise of his

constitutional rights, and which did obstruct and prevent the Plaintiff's free

exercise of Plaintiff's constitutional civil rights, in violation of the Plaintiff's

Constitutional rights and 28 U.S.C. §§ 1983 and 1985.

16.    "What may sound far-fetched to the courts is a grim reality to

Americans who are daily being targeted for daring to exercise their

constitutional rights to speak their minds, worship as they please, criticize the

government, defend themselves and their families against over-reaching

government surveillance and heavy-handed police tactics," said John W.

Whitehead, president of The Rutherford Institute and author of <u>A Government</u>

<u>of Wolves: The Emerging American Police State</u>.

**C.**   **"Operation Vigilant Angel" and "Law Enforcement Coordination Centers" - "Fusion Centers,**

17.   The top-secret "Operation Vigilant Eagle" was first mentioned in the Wall Street Journal in April 2009.

18.   Operation Vigilant Eagle was formed by DOD, DHS and the FBI as part of a larger national security effort using local "Law Enforcement Coordination Centers," known as **"Fusion Centers,"** to work with U.S. military and local police/ fire departments to systematically target and/or intimidate individuals associated with "Left Wing" and "Right Wing" extremist groups, characterized by such government agencies and departments as **"homegrown violent extremists"** who were not known to be connected to a foreign group Example include members of (Tea Party movements), citizen militia (Occupy movements), and other anti-government groups.

19.   "Fusion Centers," which previously had been illegal, were first authorized in the **Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001**, which Act  removed barriers that once restricted the sharing of information between the law enforcement and intelligence communities, while at the same time supposedly protecting American

constitutional liberties.

20.     Thereafter, **<u>The Homeland Security Act of 2002</u>** established the Department of Homeland Security (DHS) in part to improve the sharing of information among Federal, State, and local government agencies and the private sector, in order to enhance the ability to detect, identify, understand, and assess terrorist threats to and vulnerabilities of the homeland, to better protect the Nation's critical infrastructure, integrate our emergency response networks, and link State and Federal Governments in what became known as "Law Enforcement Coordination Centers" - "Fusion Centers,

21.     On October 31, 2007, President George W. Bush issued the first National Strategy for Information Sharing (the "Strategy") to prioritize and unify the Nation's efforts to advance the sharing of terrorism-related information. The Strategy integrates numerous initiatives and sets forth the Nation's plan to build upon progress made in improving information sharing since the September 11 attacks to establish an integrated National information sharing capability.

22.     The Strategy referenced above was developed using a collaborative process model and was based on significant input provided by the

federal Information Sharing Council and State, local, tribal, and private sector

officials from across the nation including from local "Fusion Centers"

referenced above.

23.     Moreover, the Strategy referenced above was allegedly designed

to assist those responsible for combating terrorism and protecting our local

communities by allowing for access to the timely and accurate information they

need by:

> "Providing a framework for enhanced information sharing among
> federal, state, local, and tribal officials, the private sector, and
> foreign partners (*i.e.,* "Fusion Centers") to aid their individual
> missions and to help secure the homeland, and to permit the
> Federal Government to support State and major urban area "Fusion
> Centers to fight crime and allegedly make American  local
> communities safer."

## D.     **DOD/ DHS/FBI/U. S. MILITARY/LOCAL POLICE-FIRE TACTICS**

24.     In certain cases, DHS and FBI agents and their agents and

associates, in conjunction with elements of the U. S. Military and their affiliated

"Citizen Volunteers," have targeted and/or intimidate innocent American

military veterans and labeled such innocent persons as mentally ill with

"oppositional-defiance disorder" ("ODD") particularly those veterans who have

chosen, however innocently, to reside near a sensitive U. S. Military

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.                                    11

installation.

25.     More recent cases show that veterans are being targeted and/or

intimidated by DOD/DHS/FBI/ Local Police/fire departments and affiliated

"Citizen Volunteers" since the beginning of "Operation Vigilant Eagle" based

solely on a veteran expressing his personal First Amendment-protected opinion

in as fundamentally-protected controversial song lyrics and political views being

posted on Facebook.

26.     Despite the fact that the U.S. boasts more than 23 million veterans

who have served in World War II through Korea, Vietnam, the Gulf War, Iraq

and Afghanistan, the plight of American military veterans today, while often

overlooked, is common knowledge: impoverished, unemployed, lacking any

decent health benefits, homeless, traumatized mentally and physically, struggling

with depression, thoughts of suicide, marital stress.

27.     Making matters worse, thanks to "Operation Vigilant Eagle,"

American military veterans returning from Iraq and Afghanistan are also being

characterized by the DOD, DHS and FBI as "extremists" and "potential domestic

terrorist threats" because they may be "disgruntled, disillusioned or suffering

from the psychological effects of war." **Exhibit A**.

28.     As a result, these servicemen and women—many of whom are

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.                                    12

decorated—are finding themselves under surveillance, threatened with

incarceration or involuntary commitment, or arrested, all for daring to voice their

concerns about the alarming state of our union and the erosion of our freedoms.

29.     But DOD, DHS and the FBI are not merely targeting American

military veterans who are voicing their discontent so much as it is tracking

individuals  trained in military warfare who are voicing feelings of discontent;

more significantly, under the guise of mental health treatment and with the

complicity of government psychiatrists and local law enforcement officials, these

veterans are increasingly being portrayed as ticking time bombs in need of

intervention.

30.     In 2012, for instance, the Justice Department launched a pilot

program aimed at training SWAT teams to deal with confrontations involving

highly trained and often heavily armed combat veterans.

31.     Since 2009, at the start of "**Operation Vigilant Eagle**," the

DOD, DHS and FBI have used local "Law Enforcement Coordination Centers"

authorized by the **2002 Patriot Act** s steadily ramped up its campaign to

"silence" dissidents, especially those with military backgrounds. Coupled with

the DHS' dual reports on Rightwing and Leftwing "Extremism," which broadly

define extremists as individuals and groups "that are mainly antigovernment,

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.                                    13

rejecting federal authority in favor of state or local authority, or rejecting

government authority entirely."

32.     Such tactics used by the DOD, DHS and FBI, in coordination with

"Citizen Volunteers" and local police and fire departments acting through local

"Law Enforcement Coordination Centers" (*i.e.,* "Fusion Centers")  pose grave

threats to anyone perceived or identified as opposing the government, regardless

of such person's degree of innocence.

33.     One particularly troubling tactic used by the DHS, FBI, military,

and local police/fire departments coordinated through local "Fusion Centers" is

the mental health label being applied to suspected veterans and others who

challenge the status quo is "oppositional defiance disorder" (ODD). As journalist

Anthony Martin explains, an ODD diagnosis

> "denotes that the person exhibits 'symptoms' such as the questioning of
> authority, the refusal to follow directions, stubbornness, the unwillingness
> to go along with the crowd, and the practice of disobeying or ignoring
> orders. Persons may also receive such a label if they are considered free
> thinkers, nonconformists, or individuals who are suspicious of large,
> centralized government... At one time the accepted protocol among
> mental health professionals was to reserve the diagnosis of oppositional
> defiance disorder for children or adolescents who exhibited uncontrollable
> defiance toward their parents and teachers."

### E.   DOD/ DHS/FBI/U. S. MILITARY/LOCAL POLICE-FIRE TACTICS  VIOLATE U. S. CONSTITUTION.

34.      This lawsuit challenges the constitutionality of  "**Operation Vigilant Eagle**," a secret government program to allow local "Fusion Centers" to coordinate and use the combined resources of the U. S. military, DHS, FBI, "Citizen Volunteers," and local police/fire departments to identify, monitor, surveil, intimidate, and/or  pre-empt actions and movements of recently-returning American Military veterans, including but not limited to the Plaintiff, who, without proof or any form of admissible evidence, has appaerently been suspected and "indicted" outside the judicial system of  sympathizing with or joining in the plans and/or actions of  militia/sovereign-citizen extremist groups," without warrants and in the absence of any judicial oversight and/or supervision.

35.      In particular,  as set forth herein, Plaintiff sues defendants Paul T. Breed, Matt Grimm as CEO of Defendant Anduril Industries, Anduril Industries, Leslie Gardner, as Executive Director of the San Diego Law Enforcement Coordination Center, the San Diego Law Enforcement Coordination Center, ("Fusion Center"), Infragard San Diego, Citizen Corps. San Diego/ San Diego Community Emergency Response Team ("CERT") John

Does 1 - 100, ABC Corpoations 1 - 20, Alejandro Mayorkas as Director of the United States Department of Homeland Security, the Department of Homeland Security, the City of Oceanside, California, the United States Department of Justice (Federal Bureau of Investigation), the United States Department of the Navy, and the United States of America, jointly and severally, each of whom were acting in concert according to a joint plan, whereby such defendants, acting collectively and  according to a common plan coordinated and conducted by the San Diego Law Enforcement Coordination Center ("Fusion Center") and outside of the guidelines of "Operation Vigilant Eagle," *inter alia*,  all such defendants and their agents and employees misused U. S. Government owned or leased assets including but not limited to drones, and/or fixed- wing aircraft owned or leased by the United States Marines, and/or police and fire department staff and equipment owned and/or operated by City of Carlsbad employees, on a daily basis for the past three (3) years to wrongfully surveil, harass, intimidate, and interfere with Plaintiff's freedom of movement and right to privacy without warrant or Court supervision of oversight, and such defendants, acting jointly and according to a common plan, further misused and interfered with Plaintiff's access to and use of means of interstate communications, the Internet, interstate telephonic communications

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.                                                    16

and which Defendants, acting jointly according to a common plan, further

converted and misused police and confidential governmental technology

and/or databases,  all as part of a deliberate and wronful campaign of wrongful

and illegal actions which were intended to and did intimidate, terrorize,

interfere with, and oppress the Plaintiff, by means of physically dangerous

emotionally violent injurious and damaging actions, including but not limited

almost daily dangerous and harassing "buzzing" of Plaintiff, Plaintiff's home

and Plaintiff's movements by automobiles, firetrucks, drones and fixed-wing

aircraft, often within ten (10) feet of Plaintiff, Plaintiff's automobile, and/or

Plaintiff's home, all pursuant to the joint plan of all Defendants to harass and

intimidate and otherwise obstruct the Plaintiff's free exercise of his

constitutional rights, and which did obstruct and prevent the Plaintiff's free

exercise of Plaintiff's constitutional civil rights, in violation of, *inter alia*, the

Plaintiff's civil and Constitutional rights and 28 U.S.C. §§ 1983 and 1985.

36.   By seriously compromising the free movement  and privacy

rights of the Plaintiff, "Operation Vigilant Eagle," as such was applied to the

Plaintiff, also violated the First and Fourth Amendments of the United States

Constitution. It also violates constitutional separation of powers principles, because it was

authorized by President George W. Bush in excess of his Executive authority and contrary to

limits imposed by Congress.

37.   In response to widespread systematic domestic surveillance abuses committed by the Executive Branch and exposed in the 1960s and 1970s, Congress enacted legislation that provides "the *exclusive means* by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted. **18 U.S.C. § 2511(2)(f)**.

38.   Moreover, it is a crime to use U. S. military weapons and technology against U.S. civilians.  *See, e.g.,* **10 U. S. C. § 950(t)(2).**


## II.   **JURISDICTION, AND VENUE.**

39.   This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the United States Constitution and

**28  U.S.C. § 1331**. This Court also has jurisdiction under the Administrative Procedures Act, **5 U.S.C. § 702**. This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.  Venue is proper in this district under 28 U.S.C. § 1391(e).

### III.        PARTIES.

40.      Plaintiff **JOSEPH BRADY** ("Plaintiff") is a natural person who is a U. S. citizen who resides in the City of Oceanside, CA, directly adjacent to the U.S. Marine Corp.'s Camp Pendleton, who is subject to the jurisdiction of this Court.

41. Defendant **Paul T. Breed** is a resident of Orange County, CA, at 712 E. Solana Circle, Solana, CA, who is subject to the jurisdiction of this Court, and Defendant Breed may be served with a copy of the Complaint and process at such address.

42. Defendant **Matt Grimm** is the Chief Operating Officer of Defendant Anuril Industries, who resides at 1300 - 1448 Reynolds Ave, Irvine, CA 92614 who is subject to the jurisdiction of this Court. Defendant Grimm may be served with a copy of the Complaint and process at such address.

43. Defendant **ANDURIL INDUSTRIES** is a California limited partnership located at 1300 - 1448 Reynolds Ave, Irvine, CA 92614 who is subject to the jurisdiction of this Court. Defendant ANDURIL INDUSTRIES may be served with a copy of the Complaint and process at such address.

44.      Defendant **LESLIE GARDNER**, the Executive Director of the San Diego Law Enforcement Coordination Center ("Fusion Center"), resides at 2434

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.                                          19

Mica Road, Carlsbad, CA who is subject to the jurisdiction of this Court.

Defendant LESLIE GARDNER may be served with a copy of the Complaint and

process at such address.

45.  Defendant **SAN DIEGO LAW ENFORCEMENT**

**COORDINATION CENTER** is located  at  8880 Rio San Diego Road, San

Diego, CA 92101 and is subject to the jurisdiction of this Court.  Defendant **SAN**

**DIEGO LAW ENFORCEMENT COORDINATION CENTER** may be served

with a copy of the Complaint and process at such address.

46.   Defendant **City of Oceanside, California**, is an incorporated city in

California located within the Southern District of the United States District Court,

San Diego Divisio, and such ciy is subject to the jurisdiction of this Court.

Defendant City of Oceanside, CA may be served with a copy of the Complaint and

process by serving the same upon the City Manager, 300 N. Coast Hwy. Oceanside,

CA 92054.

47.   Defendant INFRAGARD SAN DIEGO is a private DOD/ DHS/

FBI affiliated and funded non-profit 501(c)(3) organizationwhose mission is to

"mitigate criminal and terrorist threats, risks and loss for the purpose of protecting

the region's critical infrastructure and the American people."

INFRAGARD is an information-sharing and analysis effort serving the

interests and confirming the knowledge base of a wide range of private sector and

government members, and such entity is subject to the jurisdiction of this Court.

San Diego, CA 92191.  Defendant INFRAGARD may be served with a copy of the

Complaint and process  at 3974 Sorrento Valley Blvd., #910551, 300 N. Coast

Hwy. Oceanside, CA 92054.

48.    Defendant CITIZEN CORPS SAN DIEGO/ COMMUNITY

EMERGENCY RESPONSE TEAM ("CERT") is a public/private partnership

affiliated with and funded by Defendants DHS and FEMA.  Defendant CITIZEN

CORPS  may be served with a copy of the Complaint and process at 3225 N. Haron

Drive, San Diego, CA 92101.

49.    Defendant JOHN DOES 1 - 99 are fictitious parties, the true

identity(ies) of which have not yet been fully determined, and further are residents

of the State of California,  and upon information and belief,  are "citizen

Volunteers" or are persons employed by and/or are associated with firemen and/or

police officers employed by the City of  Oceanside, CA.

**IV.      Relevant Facts.**

**A.      Camp Pendleton- Marine Corps Warfighting Lab -
          Anduril Industries - Joint Drone Surveillance Pilot Project.**

50.      Beginning in early 2018, Defendant ANDURIL INDUSTRIES has developed a "Lattice Modular Heli Drone" which Anduril management tested, demonstrated, and proposed to the Marine Corps. Warfighting Lab at at the Red Beach training area at Camp Pendleton, which testing later resulted in a pilot project Agreement being entered into between Anduril and the Marine Corps. Warfighting Lab.  **Exhibit B**, Anduril Industries November 2018 Press Release.

51.      Defendant Anduril Industries promoted the testing and purchase by the Marine Corps. Warfighting Lab of Anduril's "DragonDrone," which is an unmanned vehicle (UAV) 5 feet and 3 inches long  by 1 foot and 5 inches in height, with a wing span of 8 feet and 3 inches;  at a maximum weight of 100 pounds, the Dragon Drone can carry up to 20 pounds of cargo, such as jammer packages, flares, nuclear, biological and chemical sensors, or day or night cameras with laser range finders.

52.      Defendant Anduril Industries promoted the testing and sale of Anduril's "DragonDrone" to the Marine Corps. Warfighting Lab to demonstrate the UAV's capabilities and potential for increasing security at Camp Pendleton and other Marine Corps. bases throughout the U. S..  **Exhibit B**, Anduril Industries November 2018 Press Release.

**B.    San Diego Law Enforcement Coordination Center  and Marine Corps. Warfighting Lab Agree to Use Anduril "DragonDrone" to support "Operation Vigilant Eagle activities.**

53.    On information and belief, and upon which it is alleged, in mid-2018, the Marine Corps. Warfighting Lab and Defendant San Diego Law Enforcement Coordination Center ("Fusion Center") reached and entered into  an informal agreement whereby the Marines would allow  the Anduril Industries "DragonDrone" to be used to support "Operation Vigilant Eagle" activities against U. S. military veterans whom Defendants DHS and FBI suspected of harboring antigovernment sentiments.

54.    On further information and belief, upon which it is alleged, Defendants DHS and FBI compiled an "action list" of the names and addresses of recent U.S. military veterans who were then residing near the Marines' Camp Pendleton Base.

55.    On further information and belief, once Defendants DHS and FBI had compiled the "action list" of the names and addresses of recent U.S. military veterans who were then residing near the Marines' Camp Pendleton Base, such "action list" was delivered to the Executive Director of Defendant San Diego Law Enforcement Coordination Center" (SDLECC), and the SDLCC would coordinate elements of the police and fire departments of  Defendant City of Oceanside to use

the "DragonDrones" of Defendant Anduril Industries and other fixed-wing aircraft

to systematically identify, monitor, surveil, harass, intimidate, and pre-empt actions

and movement of recently-returning American Military veterans, including but not

limited to the Plaintiff, who might possibly "sympathize with or join in the plans

and/or actions of militia/sovereign-citizen extremist groups," in the absence of any

supporting evidence and without any supervision by a Court of competent

jurisdiction.

56.     Upon further information and belief, it is further alleged that, by

mid-2018, after Defendant SDLECC ("Fusion Center") obtained lists of recent U.

S. military veterans residing near the Marine Base and Camp Pendleton from the

DOD, DHS, and FBI, Defendant SDLECC coordinated activities of elements of the

Oceanside police and fire departments with pre-scheduled flights of the

Marine/Anduril "DragonDrones" and other fixed-wing aircraft to systematically

identify, monitor, surveil, harass, intimidate, and pre-empt actions and movement

of all recently-returning American Military veterans, including but not limited to

the Plaintiff living near the Camp Pendleton Marine Base, who might possibly

"sympathize with or join in the plans and/or actions of militia/sovereign-citizen

extremist groups," without first securing any evidence supporting the view that

Plaintiff had ever engaged or condiered engaging in any anti-government activity

or rhetoric, and such illegal and wrongful activity against the innocent Plaintiff was approved and signed off and approved by the Executive Director of Defendant SDLECC.

**C.    Plaintiff, who is innocent of any and all antigovernment activities, was made a target of harassing and intimidating tactics by Oceanside police and fire departments as well as daily drone and fixed-wing aircraft "buzzing" intimidation and harassment by the Marines/Defendant Anduril's "DragonDrones" being coordinated by Defendant San Diego Law Enforcement Coordination Center.**

57.    Plaintiff was honorably discharged from the United States Marine Corp. on November 12, 2000, with the rank of Corporal, had been trained as 2171 Optical Instrument Repairer, with a Rifle Expert Badge, and Military Education in Small Missile Maintenance and Coaches Instructor training.

58.    In 2007, Plaintiff purchased a residence in Oceanside, CA, directly adjacent to the U. S. Marine Corps' Camp Pendleton Base.

59.    At no time before or after 2000 has the Plaintiff been a member of or associated with any anti-government group or militia group or "white supremacist" militia of any kind.

60.    At no time before or after 2000 has the Plaintiff ever expressed any anti-government sentiment or opinion of any kind on Facebook or any other social

medium.

61.    At no time before or after 2000 has the Plaintiff suffered from or been treated for any form of psychiatric illness.

62.    At no time before or after 2000 has the Plaintiff been arrested for any reason.

63.    At no time before or after 2000 has the Plaintiff  "sympathized with or joined in the plans and/or actions of  any militia/sovereign-citizen extremist or similar groups."

64.    Beginning three years ago, and continuously thereafter, Plaintiff began experiencing being harassed and intimidated by physically dangerous, emotionally violent, and other injurious and damaging actions, including but not limited almost daily dangerous and harassing "buzzing" of Plaintiff, Plaintiff's home and Plaintiff's movements by drones and fixed-wing aircraft, often within ten (10) feet of Plaintiff, Plaintiff's automobile, and/or Plaintiff's home, which wrongful actions did obstruct and prevent the Plaintiff's free exercise of Plaintiff's constitutional civil rights, in violation of the Plaintiff's Constitutional rights and 28 U.S.C. §§ 1983 and 1985.

65.    In particular, Plaintiff was repeatedly and recklessly "buzzed by drones meeting the desription of the Marine/ Anduril "DragonDrones" and fixed

wing aircraft owned by Defendant **Paul T. Breed,** a resident of Orange County, CA, at 712 E. Solana Circle, Solana, CA, whose tail numbers were "N149X" and "N9242."

### D.   Plaintiff has been damaged by the wrongful and illegal actions of Defendants DHS, FBI, Anduril Industries, Breed, City of Oceanside, and SDLECC.

66.    As set forth herein, Plaintiff has been damaged by Defendants' multiple violations undertaken jointly and according to a common plan to violate Plaintiff's Constitutional and other legal rights in connection with unlawful surveillance, investigation, harassment, and campaign to curb and limit Plaintiff's freedom of movement orchestrated by the San Diego Law Enforcement Coordination Center (*i.e.,* "Fusion Center") as directed by DHS, FBI, and U. S. Military elements pursuant to but in violation of the guidelines set for "Operation Vigilant Eagle."

67.    In particular, Plaintiff has been damaged, *inter alia,* by the following, each of which were proximately caused by the wrongful and illegal actions of the Defendants, acting in concert according to a common plan, among others:

    a.   Being subjected to implicit death threats arising out of the reskless and

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.

27

dangerous actions of the Defendants;

b. Inability to travel safely and freely, either domestically or internationally;

c. Irreparable damage to Plaintiff's reputation;

d. Economic losses, (past, present and future) from the erosian and/or destruction of his ability to continue conducting any kind of business through his own companies, because for example, persons, governments and entities could elect not to contract with Plaintiff, including banks and other business entities with whom Plaintiff had previously worked;

e. Economic losses (past, present and future), from being rendered effectively unemployable;

f. Economic losses due to previously unnecessary expenses directly caused from having to relocate and travel and other security measures in response to death-threatening behavior;

g. Economic losses due to the otherwise unnecessary expenses of responding to government investigations and being involved in litigation, including document preparation, costs, expenses, expert fees, and attorneys' fees, for this and other cases,;

h. Pain and suffering damages – anxiety, stress, etc., for Plaintiff, and in

response to the effects on close family members of death-threatening behavior of the Defendants against the Plaintiff.

68.     Plaintiff expects the total amount of damages proximately caused by the wrongful and illegal actions of the Defendants, acting in concert according to a common plan, to exceed more than $3.9 million, to be proven at trial before a jury of fair and enlightened consciences.


## CAUSES OF ACTION

COUNT 1.     Plaintiffs respectfully seek a declaration that  "Operation Vigilant Eagle" is unlawful, and a permanent injunction against its use.

COUNT 2.     "Operation Vigilant Eagle" violates Plaintiffs' free speech and associational rights guaranteed by the First Amendment. and right to freedom of movement guaranteed by the U. S. Constitution.

COUNT 3.   "Operation Vigilant Eagle" violates Plaintiffs' privacy rights guaranteed by the Fourth Amendment.

COUNT 4.   "Operation Vigilant Eagles," as implemented and coordinated in Plaintiff's case by Defendant San Diego Law Enforcement Coordination violates the principle of separation of powers because it was authorized by President Bush in excess of his Executive authority under Article

II of the United States Constitution and is contrary to limits imposed by Congress.

COUNT 5.   "Operation Vigilant Eagle" violates the Administrative Procedures Act because the actions of Defendants DHS/FBI/SDLECC with respect to the Plaintiff under the Program exceed statutory authority and limitations imposed by Congress through FISA and Title III; are not otherwise in accordance with law; are contrary to constitutional right; and are taken without observance of procedures required by law.

COUNT 6.   Plaintiff is entitled to recover damages from the Defendants, jointly and severally, for the wrongful and illegal actions taken by such Defendants against the Plaintiff, in an amount to be determined at trial by a jury of fair and enlightened consciences.

*Brady v. Breed et al,* USDC SDCA SD,
Complaint pursuant to 28 U.S.C. § 1983, 1985.

30

**PRAYER FOR RELIEF**

**WHEREFORE, plaintiff JOSEPH BRADY prays for the following relief:**

1.     **The relief prayed for in Count 1 above;**

2.     **The relief prayed for in Count 2 above;**

3.     **The relief prayed for in Count 3 above;**

4.     **The relief prayed for in Count 4 above;**

5.     **The relief prayed for in Count 5 above;**

6.     **The relief prayed for in Count 6  above;**

7.     that Plaintiff be awarded his attorney fees and expenses from the Defendants, jointly and severally, in their entirety;

8.     that all costs be  cast against all  the Defendants, jointly and severally; and

9.     That such other and further relief be awarded to the Plaintiff as justice may suggest or require.

**A JURY TRIAL IS DEMANDED.**

Plaintiff hereby demands a jury trial, pursuant to the Sixth and Fourteenth Amendments to the Constitution of the United States, as to all claims for damages.

This 7th day of August, 2021.

_____
JOSEPH  BRADY, Plaintiff pro se

603 Seagaze Drive, #1046
Oceanside, CA  92054
Tel: (760)803-7172

31

## **VERIFICATION**

COMES NOW, plaintiff **JOSEPH BRADY**,  after being duly

sworn, hereby declares, pursuant to 28 U.S.C.§ 1746, under penalty of perjury

that  the statements of fact set forth in the foregoing Verified Complaint are true

and correct.

This __7__ day of ~~August~~ *Sept*, 2021.

JOSEPH  BRADY, Plaintiff pro se

Sworn to and subscribed
before me this ___ day of August, 2021.

Notary Public
My Commission Expires:

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "A"**

**Human Rights Watch Newsletter, 2017**

✕

We use cookies, tracking technologies, and third-party analytics tools to better understand who is using the website and improve your experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept Other options

◯ Necessary Cookies
Some cookies are necessary for the functioning of Human Rights Watch's website.
☑ Analytics Cookies
These cookies allow us to understand how people are using the site and improve their experience.
☑ Marketing Cookies
We use marketing cookies to better understand our audience and increase effectiveness of outreach.

Save preferences



DONATE NOW

HUMAN RIGHTS WATCH      :00AM EDT

Español        new posts   new posts        new posts        new posts              new posts

## US: New Evidence Suggests Monitoring of Americans

Documents Point to Warrantless Surveillance

Pentagon building

An aerial view of the Pentagon building in Washington, June 15, 2005. © 2005 Reuters

(New York) – Newly released documents reveal a US Defense Department policy that appears to authorize warrantless monitoring of US citizens and green-card holders whom the executive branch regards as "homegrown violent extremists," Human Rights Watch said today. Separately, the documents also reinforce concerns that the government may be gathering very large amounts of data about US citizens and others without warrants. Both issues relate to a longstanding executive order that is shrouded in secrecy and should be a focus of congressional inquiry.

The new materials, which Human Rights Watch obtained through a freedom of information request, are training modules that primarily concern Executive Order 12333 (EO 12333). That order broadly governs the US intelligence agencies' activities, and includes provisions allowing the agencies to collect information on US persons – meaning US citizens and lawful permanent residents, as well as some corporations and associations – in a manner the government has never fully explained to the public. The training slides largely summarize Defense Department procedures concerning EO 12333 that were released in 2016, updating a 1982 version. Using plain language to demystify the procedures' phrasing, the slides offer hints about Defense Department intelligence practices that require further inquiry and exposure.

"These documents point to just how thoroughly the public has been kept in the dark about warrantless surveillance under Executive Order 12333," said Sarah St.Vincent, US surveillance and national security researcher at Human Rights Watch.

"Their explanations of the order suggest that the government may be carrying out monitoring that poses serious problems for human rights, and Congress should seek more information about what the intelligence agencies are doing in this respect."

One of the documents' most troubling aspects is the indication that the Defense Department has authorized its intelligence components to carry out at least some forms of monitoring of US persons without a warrant, based on designations that use unknown and potentially discriminatory criteria. Specifically, one of the training documents indicates that this monitoring is permitted for US persons whom the government regards as "homegrown violent extremists" (referred to as "HVEs" in the slides) – even when they have "no specific connection to foreign terrorist(s)." The government's basis for this authorization is a revised definition of "counterintelligence" collection found in the 2016 procedures.

The procedures address several forms of surveillance, and it is unclear which types the government plans to use when monitoring "homegrown violent extremists." However, a current senior Defense Department official who provided comments to Human Rights Watch on condition of anonymity stated that "the [Department's] counterintelligence elements would be unable to collect necessary information on potential HVEs" without this change.

The Defense Department official did not respond to a question from Human Rights Watch about whether the monitoring of US persons under this policy may include electronic surveillance. If it does, this would raise concerns that the government is violating – or believes it is exploiting a possible loophole in – federal law, which generally prohibits deliberate spying on the content of US persons' telephone or internet communications without a warrant.

The authorities may only obtain such a warrant if they show probable cause to believe that the person has committed or is about to commit a crime, or that the person is "a foreign power or an agent of a foreign power." The disclosure of the government's policy regarding the surveillance of "homegrown violent extremists" who are not connected to a foreign group raises concerns about whether intelligence and/or law enforcement bodies are using EO 12333 to do an end-run around these legal protections.

Human Rights Watch is also concerned about the methods and criteria the government may be using to define and identify "homegrown violent extremists," and particularly about the risk that people who are exercising their legitimate free-expression rights will be targeted for monitoring in a discriminatory or arbitrary manner. As an example of a "homegrown violent extremists," the Defense Department official who commented to Human Rights Watch pointed to individuals who "may be self-radicalized via the internet, social media, etc., and then plan or execute terrorist acts in furtherance of the ideology or goals of a foreign terrorist group." However, the official did not respond to a question about the criteria the executive branch uses when designating a US person a "homegrown violent extremist" for the purposes of this policy.

Additional questions remain about the range of agencies that may warrantlessly monitor such individuals. The Defense Department official's comments imply that the policy disclosed in the slides applies to the Department's "counterintelligence elements," such as the Naval Criminal Investigative Service and the Air Force Office of Special Investigations. These bodies, the official stated, "investigate activities by active duty military members of their Service or [Defense Department] civilian personnel engaged in activities targeted against interests of their Service." The official noted, "If the military counterintelligence elements conduct investigations of persons other than active duty military members, they do so jointly with the FBI [Federal Bureau of Investigation]."

Although the official's remarks focused on the military counterintelligence bodies, further information is needed about whether other agencies – such as the National Security Agency ("NSA") or the FBI – may rely on similar policies to identify and/or monitor US persons who do not have an affiliation with the military, Human Rights Watch said.

The Defense Department official emphasized that "counterintelligence collection against these, or any other individuals or groups, must be predicated upon the 'reasonable belief' standard, which is reviewed through the operational and legal chain of command prior to initiation of any activity. Field personnel may not rely solely upon 'hunches' or intuition' as justification for the initiation of counterintelligence activities." However, the government's failure to disclose its methods and criteria for designating US-person "extremists" makes the effectiveness of these stated protections difficult to evaluate.

"The government's authority to monitor people doesn't depend on their beliefs, or what the government thinks they believe, but on specific evidence that gives sufficient reason to think a criminal offense is occurring or that the person is an agent of a foreign power," St.Vincent said. "A secret determination that someone's rights should be curtailed based on undisclosed criteria is incompatible with the rule of law. The government should explain what it's doing as well as its legal basis for doing it."

A separate problem to which some of the newly released materials point is the potential volume of data collection – including collection affecting US persons – under EO 12333. The 2016 procedures created the category of "special circumstances collection" to encourage the authorities to consider whether surveillance activities "raise special circumstances" and merit extra safeguards based on "the volume, proportion, and sensitivity" of US-person information the government is likely to obtain.

(The category itself does not authorize any surveillance that could not otherwise take place under the order.) However, the training documents use the informal term "big data" to describe "special circumstances collection," raising the possibility that the government may be carrying out or contemplating surveillance on a massive scale.

Documents revealed by the former NSA contractor Edward Snowden beginning in 2013 have indicated that the government uses EO 12333 as the basis for bulk communications surveillance programs overseas. However, these new references to "big data," while fleeting, appear to represent one of the most direct acknowledgments yet by the government that warrantless monitoring under the order may entail seizing very large or systematic sets of data – including about US persons.

Details regarding the newly released documents are provided below, and the documents themselves are posted on the Human Rights Watch website. Human Rights Watch shared the documents with Reuters, which published a related story on October 25.

Human Rights Watch is also releasing documents obtained from the National Reconnaissance Organization and the Department of Homeland Security's Office of Intelligence and Analysis.

**To view the documents, please visit:**

Air Force Office of Special Investigations FOIA documents

National Reconnaissance Office FOIA documents

DHS Office of Intelligence and Analysis FOIA documents

The following are elements of the training documents obtained by Human Rights Watch that give rise to new concerns.

1. *Expansion of warrantless Defense Department intelligence collection on US persons for "counterintelligence" purposes to include "homegrown violent extremists"*

One of the documents indicates that pursuant to a 2016 change in procedures concerning Executive Order 12333, the Defense Department may now extend the monitoring of US persons for "counterintelligence" purposes to people the government regards as "HVEs," which a senior Defense Department official consulted by Human Rights Watch confirmed means "homegrown violent extremists." The official indicated that the term is "shorthand ... used in the counterintelligence community to describe people who may not have a specific connection to a particular foreign terrorist group but are engaged in violent extremist activities, often following engagement with these groups' propaganda on the Internet or social media, etc."

The procedures themselves do not directly mention such "homegrown violent extremists," instead providing in more general terms that the monitoring of US persons for "counterintelligence" purposes may extend to "[a]n individual, organization, or group reasonably believed to be acting for, or in furtherance of, the goals or objectives of an international terrorist or international terrorist organization, for purposes harmful to the national security of the United States."

In indicating that this category includes "HVEs," the training document depicts this expansion of the "counterintelligence" collection definition as a "[k]ey" change in the new procedures. The document indicates that the change allows the collection of intelligence on US persons even in the absence of a "specific connection to foreign terrorist(s)." As examples, it alludes to the individuals who carried out mass shootings in San Bernardino, California in 2015, and in Orlando, Florida in 2016.

(click to view larger)

(click to view larger)

The Defense Department's methods and criteria for identifying "homegrown violent extremists" remain unclear, raising fears that the designation could be applied in ways that are arbitrary, inconsistent, or discriminatory. It is also unknown whether US persons who merely exercise their free-expression rights by visiting a controversial website, espousing certain political or religious views, or criticizing the government might be targeted.

The government also has not yet disclosed its legal justification for this policy, especially insofar as it involves any warrantless monitoring of US persons that would normally require a warrant under the Foreign Intelligence Surveillance Act, other statutes, or Fourth Amendment case law. The government should fully disclose the policy, its legal underpinnings, the type(s) of monitoring to which it may lead, and its anticipated and actual application.

Human Rights Watch remains concerned that several other aspects of this important policy change have not yet been publicly revealed. For example, as mentioned above, it is not yet clear whether the policy (or a similar one) may also apply to the NSA or non-Defense intelligence agencies, or whether people who have no affiliation with the Defense Department may be monitored.

2. *"Special circumstances" collection and references to "big data"*

The Defense Department procedures adopted in 2016 refer to the idea of "Special Circumstances Collection": intelligence "collection opportunities" for which certain extra safeguards may be appropriate due to the "volume, proportion, and sensitivity of the [US person information] likely to be acquired," as well as the "intrusiveness of the methods used to collect the

information." The Defense Department official Human Rights Watch consulted said the concept of special circumstances collection itself "does not provide any new or independent authority to conduct electronic surveillance"; that is, it does not give the Defense Department any powers it did not already have. However, the scope and scale of such collection is unknown, including the kinds of data that may be collected.

Two of the newly disclosed training documents suggest that at least some of the collection the government may be carrying out that falls into the "special circumstances" category includes the gathering of "big data" – a term that lacks a settled definition but can refer to enormous troves of information. These explicit references to "big data" raise renewed concerns that under EO 12333, the government may be sweeping up huge amounts of data containing private communications or other sensitive information – including information belonging to US persons. They may also be some of the most direct acknowledgments yet by the government itself of this possibility.

(click to view larger)

(click to view larger)

The possibility of the collection of "big data" is particularly troubling in light of the Defense Department's power to disseminate "large amounts of unevaluated" information about US persons to entities both within and outside the federal government, as confirmed in the 2016 procedures.

Congress should seek, and the executive branch should provide, detailed explanations of the scale and nature of all "special circumstances collection" activities, including their impact on US persons.

### 3. *"Physical surveillance" of non-US persons in the United States*

The 2016 Defense Department procedures define "physical surveillance" as the "deliberate and continuous observation ... of a person to track his or her movement or other physical activities while they are occurring, under circumstances in which the person has no reasonable expectation of privacy," and say this monitoring may include the use of "enhancement devices" such as "binoculars or still or full motion cameras."

The new training documents highlight a section of these procedures that allows the Defense Department's intelligence components to conduct such physical surveillance of any non-US person in the US without a warrant, as long as the

surveillance takes place for "an authorized foreign intelligence or [counterintelligence] purpose." Non-US persons in the US include undocumented immigrants and temporary visa holders.

By comparison, the Defense Department's intelligence components may only subject US persons in the US to such physical surveillance if they are current or prospective employees of (or contractors for) those components, or if they are members of another element of the armed services.

(click to view larger)

UNCLASSIFIED//FOR OFFICIAL USE ONLY



Assessment

# (U//FOUO) Rightwing Extremism: Current Economic and Political Climate Fueling Resurgence in Radicalization and Recruitment

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY



# (U//FOUO)  Rightwing Extremism: Current Economic and Political Climate Fueling Resurgence in Radicalization and Recruitment

**7 April 2009**

*(U)  Prepared by the Extremism and Radicalization Branch, Homeland Environment Threat Analysis Division.  Coordinated with the FBI.*

## (U)  Scope

*(U//FOUO)  This product is one of a series of intelligence assessments published by the Extremism and Radicalization Branch to facilitate a greater understanding of the phenomenon of violent radicalization in the United States.  The information is provided to federal, state, local, and tribal counterterrorism and law enforcement officials so they may effectively deter, prevent, preempt, or respond to terrorist attacks against the United States.  Federal efforts to influence domestic public opinion must be conducted in an overt and transparent manner, clearly identifying United States Government sponsorship.*

(U) **LAW ENFORCEMENT INFORMATION NOTICE:** This product contains Law Enforcement Sensitive (LES) information.  No portion of the LES information should be released to the media, the general public, or over non-secure Internet servers.  Release of this information could adversely affect or jeopardize investigative activities.

(U) **Warning:** This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO).  It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.  State and local homeland security officials may share this document with authorized security personnel without further approval from DHS.

(U) All U.S. person information has been minimized.  Should you require the minimized U.S. person information, please contact the DHS/I&A Production Branch at IA.PM@hq.dhs.gov, IA.PM@dhs.sgov.gov, or IA.PM@dhs.ic.gov.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## (U)  Key Findings

*(U//LES)  The DHS/Office of Intelligence and Analysis (I&A) has no specific information that domestic rightwing[*] terrorists are currently planning acts of violence, but rightwing extremists may be gaining new recruits by playing on their fears about several emergent issues.  The economic downturn and the election of the first African American president present unique drivers for rightwing radicalization and recruitment.*

— *(U//LES)  Threats from white supremacist and violent antigovernment groups during 2009 have been largely rhetorical and have not indicated plans to carry out violent acts.  Nevertheless, the consequences of a prolonged economic downturn—including real estate foreclosures, unemployment, and an inability to obtain credit—could create a fertile recruiting environment for rightwing extremists and even result in confrontations between such groups and government authorities similar to those in the past.*

— *(U//LES)  Rightwing extremists have capitalized on the election of the first African American president, and are focusing their efforts to recruit new members, mobilize existing supporters, and broaden their scope and appeal through propaganda, but they have not yet turned to attack planning.*

*(U//FOUO)  The current economic and political climate has some similarities to the 1990s when rightwing extremism experienced a resurgence fueled largely by an economic recession, criticism about the outsourcing of jobs, and the perceived threat to U.S. power and sovereignty by other foreign powers.*

— *(U//FOUO)  During the 1990s, these issues contributed to the growth in the number of domestic rightwing terrorist and extremist groups and an increase in violent acts targeting government facilities, law enforcement officers, banks, and infrastructure sectors.*

— *(U//FOUO)  Growth of these groups subsided in reaction to increased government scrutiny as a result of the 1995 Oklahoma City bombing and disrupted plots, improvements in the economy, and the continued U.S. standing as the preeminent world power.*

*(U//FOUO)  The possible passage of new restrictions on firearms and the return of military veterans facing significant challenges reintegrating into their communities could lead to the potential emergence of terrorist groups or lone wolf extremists capable of carrying out violent attacks.*

---

[*] (U) Rightwing extremism in the United States can be broadly divided into those groups, movements, and adherents that are primarily hate-oriented (based on hatred of particular religious, racial or ethnic groups), and those that are mainly antigovernment, rejecting federal authority in favor of state or local authority, or rejecting government authority entirely.  It may include groups and individuals that are dedicated to a single issue, such as opposition to abortion or immigration.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

— *(U//FOUO)  Proposed imposition of firearms restrictions and weapons bans likely would attract new members into the ranks of rightwing extremist groups, as well as potentially spur some of them to begin planning and training for violence against the government.  The high volume of purchases and stockpiling of weapons and ammunition by rightwing extremists in anticipation of restrictions and bans in some parts of the country continue to be a primary concern to law enforcement.*

— *(U//FOUO)  Returning veterans possess combat skills and experience that are attractive to rightwing extremists.  DHS/I&A is concerned that rightwing extremists will attempt to recruit and radicalize returning veterans in order to boost their violent capabilities.*

## (U)  Current Economic and Political Climate

(U//FOUO) DHS/I&A assesses that a number of economic and political factors are driving a resurgence in rightwing extremist recruitment and radicalization activity. Despite similarities to the climate of the 1990s, the threat posed by lone wolves and small terrorist cells is more pronounced than in past years.  In addition, the historical election of an African American president and the prospect of policy changes are proving to be a driving force for rightwing extremist recruitment and radicalization.

— (U) A recent example of the potential violence associated with a rise in rightwing extremism may be found in the shooting deaths of three police officers in Pittsburgh, Pennsylvania, on 4 April 2009.  The alleged gunman's reaction reportedly was influenced by his racist ideology and belief in antigovernment conspiracy theories related to gun confiscations, citizen detention camps, and a Jewish-controlled "one world government."

## (U)  Exploiting Economic Downturn

(U//FOUO) Rightwing extremist chatter on the Internet continues to focus on the economy, the perceived loss of U.S. jobs in the manufacturing and construction sectors, and home foreclosures.  Anti-Semitic extremists attribute these losses to a deliberate conspiracy conducted by a cabal of Jewish "financial elites."  These "accusatory" tactics are employed to draw new recruits into rightwing extremist groups and further radicalize those already subscribing to extremist beliefs.  DHS/I&A assesses this trend is likely to accelerate if the economy is perceived to worsen.

## (U)  Historical Presidential Election

(U//LES) Rightwing extremists are harnessing this historical election as a recruitment tool.  Many rightwing extremists are antagonistic toward the new presidential administration and its perceived stance on a range of issues, including immigration and citizenship, the expansion of social programs to minorities, and restrictions on firearms

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

ownership and use.  Rightwing extremists are increasingly galvanized by these concerns and leverage them as drivers for recruitment.  From the 2008 election timeframe to the present, rightwing extremists have capitalized on related racial and political prejudices in expanded propaganda campaigns, thereby reaching out to a wider audience of potential sympathizers.

— (U//LES)  Most statements by rightwing extremists have been rhetorical, expressing concerns about the election of the first African American president, but stopping short of calls for violent action.  In two instances in the run-up to the election, extremists appeared to be in the early planning stages of some threatening activity targeting the Democratic nominee, but law enforcement interceded.

## (U)  Revisiting the 1990s

(U//FOUO)  Paralleling the current national climate, rightwing extremists during the 1990s exploited a variety of social issues and political themes to increase group visibility and recruit new members.  Prominent among these themes were the militia movement's opposition to gun control efforts, criticism of free trade agreements (particularly those with Mexico), and highlighting perceived government infringement on civil liberties as well as white supremacists' longstanding exploitation of social issues such as abortion, inter-racial crimes, and same-sex marriage.  During the 1990s, these issues contributed to the growth in the number of domestic rightwing terrorist and extremist groups and an increase in violent acts targeting government facilities, law enforcement officers, banks, and infrastructure sectors.

## (U)  Economic Hardship and Extremism

(U//FOUO)  Historically, domestic rightwing extremists have feared, predicted, and anticipated a cataclysmic economic collapse in the United States.  Prominent antigovernment conspiracy theorists have incorporated aspects of an impending economic collapse to intensify fear and paranoia among like-minded individuals and to attract recruits during times of economic uncertainty.  Conspiracy theories involving declarations of martial law, impending civil strife or racial conflict, suspension of the U.S. Constitution, and the creation of citizen detention camps often incorporate aspects of a failed economy.  Antigovernment conspiracy theories and "end times" prophecies could motivate extremist individuals and groups to stockpile food, ammunition, and weapons.  These teachings also have been linked with the radicalization of domestic extremist individuals and groups in the past, such as violent Christian Identity organizations and extremist members of the militia movement.

---

**(U//FOUO)  Perceptions on Poverty and Radicalization**

(U//FOUO)  Scholars and experts disagree over poverty's role in motivating violent radicalization or terrorist activity.  High unemployment, however, has the potential to lead to alienation, thus increasing an individual's susceptibility to extremist ideas.  According to a 2007 study from the German Institute for Economic Research, there appears to be a strong association between a parent's unemployment status and the formation of rightwing extremist beliefs in their children—specifically xenophobia and antidemocratic ideals.

---

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## (U)  Illegal Immigration

(U//FOUO)  Rightwing extremists were concerned during the 1990s with the perception that illegal immigrants were taking away American jobs through their willingness to work at significantly lower wages.  They also opposed free trade agreements, arguing that these arrangements resulted in Americans losing jobs to countries such as Mexico.

(U//FOUO)  Over the past five years, various rightwing extremists, including militias and white supremacists, have adopted the immigration issue as a call to action, rallying point, and recruiting tool.  Debates over appropriate immigration levels and enforcement policy generally fall within the realm of protected political speech under the First Amendment, but in some cases, anti-immigration or strident pro-enforcement fervor has been directed against specific groups and has the potential to turn violent.

(U//FOUO)  DHS/I&A assesses that rightwing extremist groups' frustration over a perceived lack of government action on illegal immigration has the potential to incite individuals or small groups toward violence.  If such violence were to occur, it likely would be isolated, small-scale, and directed at specific immigration-related targets.

— (U//FOUO)  DHS/I&A notes that prominent civil rights organizations have observed an increase in anti-Hispanic crimes over the past five years.

— (U)  In April 2007, six militia members were arrested for various weapons and explosives violations.  Open source reporting alleged that those arrested had discussed and conducted surveillance for a machinegun attack on Hispanics.

— (U)  A militia member in Wyoming was arrested in February 2007 after communicating his plans to travel to the Mexican border to kill immigrants crossing into the United States.

## (U)  Legislative and Judicial Drivers

(U//FOUO)  Many rightwing extremist groups perceive recent gun control legislation as a threat to their right to bear arms and in response have increased weapons and ammunition stockpiling, as well as renewed participation in paramilitary training exercises.  Such activity, combined with a heightened level of extremist paranoia, has the potential to facilitate criminal activity and violence.

— (U//FOUO)  During the 1990s, rightwing extremist hostility toward government was fueled by the implementation of restrictive gun laws—such as the Brady Law that established a 5-day waiting period prior to purchasing a handgun and the 1994 Violent Crime Control and Law Enforcement Act that limited the sale of various types of assault rifles—and federal law enforcement's handling of the confrontations at Waco, Texas and Ruby Ridge, Idaho.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

— (U//FOUO)  On the current front, legislation has been proposed this year requiring mandatory registration of all firearms in the United States.  Similar legislation was introduced in 2008 in several states proposing mandatory tagging and registration of ammunition.  It is unclear if either bill will be passed into law; nonetheless, a correlation may exist between the potential passage of gun control legislation and increased hoarding of ammunition, weapons stockpiling, and paramilitary training activities among rightwing extremists.

(U//FOUO)  Open source reporting of wartime ammunition shortages has likely spurred rightwing extremists—as well as law-abiding Americans—to make bulk purchases of ammunition.  These shortages have increased the cost of ammunition, further exacerbating rightwing extremist paranoia and leading to further stockpiling activity.  Both rightwing extremists and law-abiding citizens share a belief that rising crime rates attributed to a slumping economy make the purchase of legitimate firearms a wise move at this time.

(U//FOUO)  Weapons rights and gun-control legislation are likely to be hotly contested subjects of political debate in light of the 2008 Supreme Court's decision in *District of Columbia v. Heller* in which the Court reaffirmed an individual's right to keep and bear arms under the Second Amendment to the U.S. Constitution, but left open to debate the precise contours of that right.  Because debates over constitutional rights are intense, and parties on all sides have deeply held, sincere, but vastly divergent beliefs, violent extremists may attempt to co-opt the debate and use the controversy as a radicalization tool.

## (U)  Perceived Threat from Rise of Other Countries

(U//FOUO)  Rightwing extremist paranoia of foreign regimes could escalate or be magnified in the event of an economic crisis or military confrontation, harkening back to the "New World Order" conspiracy theories of the 1990s.  The dissolution of Communist countries in Eastern Europe and the end of the Soviet Union in the 1990s led some rightwing extremists to believe that a "New World Order" would bring about a world government that would usurp the sovereignty of the United States and its Constitution, thus infringing upon their liberty.  The dynamics in 2009 are somewhat similar, as other countries, including China, India, and Russia, as well as some smaller, oil-producing states, are experiencing a rise in economic power and influence.

— (U//FOUO)  Fear of Communist regimes and related conspiracy theories characterizing the U.S. Government's role as either complicit in a foreign invasion or acquiescing as part of a "One World Government" plan inspired extremist members of the militia movement to target government and military facilities in past years.

— (U//FOUO)  Law enforcement in 1996 arrested three rightwing militia members in Battle Creek, Michigan with pipe bombs, automatic weapons, and military

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

ordnance that they planned to use in attacks on nearby military and federal facilities and infrastructure targets.

— (U//FOUO)  Rightwing extremist views bemoan the decline of U.S. stature and have recently focused on themes such as the loss of U.S. manufacturing capability to China and India, Russia's control of energy resources and use of these to pressure other countries, and China's investment in U.S. real estate and corporations as a part of subversion strategy.

## (U)  Disgruntled Military Veterans

(U//FOUO)  DHS/I&A assesses that rightwing extremists will attempt to recruit and radicalize returning veterans in order to exploit their skills and knowledge derived from military training and combat.  These skills and knowledge have the potential to boost the capabilities of extremists—including lone wolves or small terrorist cells—to carry out violence.  The willingness of a small percentage of military personnel to join extremist groups during the 1990s because they were disgruntled, disillusioned, or suffering from the psychological effects of war is being replicated today.

— (U)  After Operation Desert Shield/Storm in 1990-1991, some returning military veterans—including Timothy McVeigh—joined or associated with rightwing extremist groups.

— (U)  A prominent civil rights organization reported in 2006 that "large numbers of potentially violent neo-Nazis, skinheads, and other white supremacists are now learning the art of warfare in the [U.S.] armed forces."

— (U//LES)  The FBI noted in a 2008 report on the white supremacist movement that some returning military veterans from the wars in Iraq and Afghanistan have joined extremist groups.

---

**(U//FOUO)  Lone Wolves and Small Terrorist Cells**

(U//FOUO)  DHS/I&A assesses that lone wolves and small terrorist cells embracing violent rightwing extremist ideology are the most dangerous domestic terrorism threat in the United States.  Information from law enforcement and nongovernmental organizations indicates lone wolves and small terrorist cells have shown intent—and, in some cases, the capability—to commit violent acts.

— (U//LES)  DHS/I&A has concluded that white supremacist lone wolves pose the most significant domestic terrorist threat because of their low profile and autonomy—separate from any formalized group—which hampers warning efforts.

— (U//FOUO)  Similarly, recent state and municipal law enforcement reporting has warned of the dangers of rightwing extremists embracing the tactics of "leaderless resistance" and of lone wolves carrying out acts of violence.

— (U//FOUO)  Arrests in the past several years of radical militia members in Alabama, Arkansas, and Pennsylvania on firearms, explosives, and other related violations indicates the emergence of small, well-armed extremist groups in some rural areas.

---

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## (U)  Outlook

(U//FOUO)  DHS/I&A assesses that the combination of environmental factors that echo the 1990s, including heightened interest in legislation for tighter firearms restrictions and returning military veterans, as well as several new trends, including an uncertain economy and a perceived rising influence of other countries, may be invigorating rightwing extremist activity, specifically the white supremacist and militia movements. To the extent that these factors persist, rightwing extremism is likely to grow in strength.

(U//FOUO)  Unlike the earlier period, the advent of the internet and other information-age technologies since the 1990s has given domestic extremists greater access to information related to bomb-making, weapons training, and tactics, as well as targeting of individuals, organizations, and facilities, potentially making extremist individuals and groups more dangerous and the consequences of their violence more severe.  New technologies also permit domestic extremists to send and receive encrypted communications and to network with other extremists throughout the country and abroad, making it much more difficult for law enforcement to deter, prevent, or preempt a violent extremist attack.

(U//FOUO)  A number of law enforcement actions and external factors were effective in limiting the militia movement during the 1990s and could be utilized in today's climate.

— (U//FOUO)  Following the 1995 bombing of the Alfred P. Murrah federal building in Oklahoma City, the militia movement declined in total membership and in the number of organized groups because many members distanced themselves from the movement as a result of the intense scrutiny militias received after the bombing.

— (U//FOUO)  Militia membership continued to decline after the turn of the millennium as a result of law enforcement disruptions of multiple terrorist plots linked to violent rightwing extremists, new legislation banning paramilitary training, and militia frustration that the "revolution" never materialized.

— (U//FOUO)  Although the U.S. economy experienced a significant recovery and many perceived a concomitant rise in U.S. standing in the world,  white supremacist groups continued to experience slight growth.

(U//FOUO)  DHS/I&A will be working with its state and local partners over the next several months to ascertain with greater regional specificity the rise in rightwing extremist activity in the United States, with a particular emphasis on the political, economic, and social factors that drive rightwing extremist radicalization.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U)  **Reporting Notice:**

(U)  DHS encourages recipients of this document to report information concerning suspicious or criminal activity to DHS and the FBI.  The DHS National Operations Center (NOC) can be reached by telephone at 202-282-9685 or by e-mail at NOC.Fusion@dhs.gov.  For information affecting the private sector and critical infrastructure, contact the National Infrastructure Coordinating Center (NICC), a sub-element of the NOC.  The NICC can be reached by telephone at 202-282-9201 or by e-mail at NICC@dhs.gov.  The FBI regional phone numbers can be found online at http://www.fbi.gov/contact/fo/fo.htm.  When available, each report submitted should include the date, time, location, type of activity, number of people and type of equipment used for the activity, the name of the submitting company or organization, and a designated point of contact.

(U)  For comments or questions related to the content or dissemination of this document, please contact the DHS/I&A Production Branch at IA.PM@hq.dhs.gov, IA.PM@dhs.sgov.gov, or IA.PM@dhs.ic.gov.

(U)  **Tracked by:** CRIM-040300-01-05, CRIM-040400-01-05, TERR-010000-01-05

UNCLASSIFIED//FOR OFFICIAL USE ONLY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "B"**

Anduril Industries Newsletter.

Scott Sanders, head of operations for Anduril Industries, prepares a Lattice Modular Heli-Drone for a test flight at the Red Beach training area, Marine Corps Base Camp Pendleton, California, Nov. 8, 2018. The Lattice Modular Heli-Drone was being tested to demonstrate its capabilities and potential for increasing security. - Image ID: R2RYE8



Scott Sanders, head of operations for Anduril Industries, prepares a Lattice Modular Heli-Drone for a test flight at the Red Beach training area, Marine Corps Base Camp Pendleton, California, Nov. 8, 2018. The Lattice Modular Heli-Drone was being tested to demonstrate its capabilities and potential for increasing security.

Contributor: David Wa / Alamy Stock Photo

Image ID: R2RYE8

File size: 5.7 MB (0.2 MB Compressed download)

Dimensions: 1732 x 1155 px | 29.3 x 19.6 cm | 11.5 x 7.7 inches | 150dpi

Releases: Model - no | Property - no   Do I need a release?